UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DESIGNWAREPRO, LLC, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. 24-2983 (ABJ) |
| RETAIL PRO SOFTWARE PTY LTD, | ) ) ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM OPINION

Petitioner DesignwarePro, LLC ("DesignwarePro") filed a petition to confirm an arbitral award against respondent Retail Pro Software Pty Ltd ("Retail Pro") pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207. Pet. to Confirm Arb. Award and Enter J. Thereon [Dkt. # 1] ("Pet.") ¶ 2. The arbitration arose from a license agreement between the parties in which respondent agreed to market and sell petitioner's software in Australia, New Zealand, and several countries in Asia. Pet. ¶ 9. After respondent breached the agreement, petitioner initiated arbitration and obtained a judgement for money damages, arbitration and attorneys' fees, an accounting of respondent's sales, and a permanent injunction. Final Award, Ex. 1 to Pet'r's Mot. for Default J. [Dkt. # 8-2] ("Final Award") at 16–17.

Petitioner effectuated service of the instant petition on October 28, 2024, Return of Serv. [Dkt. # 5], and respondent did not answer, oppose, or otherwise respond. Petitioner filed an affidavit for default on December 31, 2024, and the Clerk of Court entered default against respondent under Federal Rule of Civil Procedure 55(a). Aff. for Default [Dkt. # 6]; Clerk's Entry of Default [Dkt. # 7]. On January 8, 2025, petitioner moved for default judgment under Federal

Rule of Civil Procedure 55(b)(2).  Pet'r's Mot. for Default J. [Dkt. # 8] ("Mot.").  Respondent has not opposed or otherwise responded to the default judgment motion.

Considering petitioner's submissions and the record as a whole, the Court will **GRANT** the motion for default judgment and confirm the arbitral award.

## BACKGROUND

Petitioner is a Colorado limited liability company that owns Windowware Pro, a cloud-based computer software designed for the window covering industry.  Pet. ¶ 3; Final Award at 6.  In June 2017, petitioner entered into a license agreement with respondent, an Australian limited company.  Pet. ¶ 4; Final Award at 6.  The license agreement granted respondent exclusive right to market and distribute Windowware Pro in "Australia, New Zealand, Sri Lanka through Malaysia, Philippines, Singapore, Indonesia, Papua New Guinea, Solomon Island, New Caledonia as well as all areas that are South of mainland Asia."  License Agreement, Ex. 1 to Mot. [Dkt. # 8-2] ("License Agreement") ¶ 6.  Respondent also agreed to work with petitioner "to improve the Windowware Pro software," and as a result, the license agreement gave it access to the source code for Windowware Pro and the "complete customer list imbedded in that code."  Final Award at 6; *see* License Agreement ¶ 4 ("Buyer shall have full rights to all code on Seller's servers at all times.").

Respondent "briefly marketed and sold" the software under the terms of the license agreement, but by mid-2018, respondent had modified and rebranded Windowware Pro into "Smartpad Pro" and began selling it in the United States, United Kingdom, and Canada.  Pet. ¶ 14; Final Award at 6–7.  Smartpad Pro had the "same look and feel" as Windowware Pro, and it directly referenced "Windowware Pro" in its modified source code.  Final Award at 11.  Because respondent had access to petitioner's existing customer list, it targeted those customers in direct

competition with petitioner. *Id.* at 7. Although petitioner objected to respondent's conduct, respondent continued to sell the modified software under another name, "Quoterite." *Id.* at 8.

Pursuant to the license agreement, petitioner initiated arbitration against respondent on January 19, 2023. *Id*. at 3; *see* License Agreement ¶ 27 ("Any controversy, claim or dispute that cannot be so resolved shall be settled by final binding arbitration . . . ."). It asserted six claims: two counts of breach of contract; one count of breach of the duty of good faith and fair dealing; one count of copyright infringement; one count of misappropriation of trade secrets; and one count of unjust enrichment. Final Award at 3.

Respondent impeded and delayed the arbitration proceeding from the outset. *Id*. at 8. After petitioner served its Demand for Arbitration, respondent "refused to respond to [petitioner's] list of proposed arbitrators for several months." *Id.* During discovery, respondent failed to produce documents in accordance with the arbitral panel's rules; failed to timely respond to discovery requests; provided vague, nonspecific, and likely disingenuous answers to discovery requests; cancelled the deposition of respondent's principal code programmer just twelve hours before it was scheduled to begin and refused to reschedule; and misrepresented information to petitioner and the arbitral panel. *Id.*

Two business days before the final arbitration hearing set for October 2, 2023, respondent notified the arbitral panel of a "voluntary administration proceeding" in Australia, *id.* at 4, which is a legal process that provides businesses in financially insolvent circumstances the opportunity to reorganize and attempt recovery. *See* Voluntary Administration: What is the Process?, Worrells (Nov. 3, 2017), https://perma.cc/4LBF-7CP9. It also notified the panel that the arbitration must be stayed, or the arbitration hearing would be left undefended. Final Award at 4–5.

3

The panel stayed the arbitration proceeding and directed the parties to file reports on the status of the voluntary administration proceeding. *Id.* at 4. A month later, on October 31, petitioner reported back to the panel that it had participated in the proceeding as one of respondent's creditors and confirmed that: (1) "the administration proceeding was a voluntary proceeding initiated by [r]espondent's principal, Aaron LeCornu"; (2) the government administrators "concluded that [r]espondent had not been insolvent" when it initiated the proceeding; and (3) LeCornu had "placed the Company into voluntary administration as *he* determined that the Company was likely to become insolvent as a result of the Arbitration Proceedings." *Id.* at 4 (internal quotation marks omitted). The panel determined that the arbitration should proceed, and it set the final arbitration hearing for April 16, 2024. *Id.* at 5.

At the hearing, petitioner presented the testimony of its Chief Executive Officer and an expert witness, and it offered exhibits that included the transcript of the deposition of LeCornu. *Id.* Respondent did not appear or submit any written evidence at the final arbitration hearing. *Id.*

The arbitral panel issued its final award on May 24, 2024. Final Award at 2. On the merits, the panel found for petitioner on all of its asserted claims. It found that that respondent breached the license agreement and the covenant of good faith and fair dealing by selling the Windowware Pro software outside the designated territories and failing provided petitioner with a report of annual sales and gross income. *Id.* at 9–11. It found that respondents infringed petitioner's copyright rights in the Windowware Pro software by developing a nearly identical software that directly referenced "Windowware Pro" within source code. *Id.* at 11–12. It also found that respondent misappropriated trade secrets by accessing petitioner's confidential customer list to take its clients in the United States, United Kingdom, and Canada. *Id.* at 12–13. Finally, the panel

4

agreed with petitioner that respondent improperly entered into the voluntary administration to attempt to circumvent any resulting liability from the arbitration.  *Id.* at 9.

As to damages, the arbitral panel found that respondent was unjustly enriched from its violations of law in the amount of $1,452,649.16 AUD, and that petitioner was entitled to an accounting from respondent of all sales of SmartPad Pro and Quoterite since June 26, 2023.  *Id.* at 13–14.  The panel also awarded petitioner attorney fees and all arbitration expenses, finding that respondent "acted maliciously or in extreme bad faith in connection with the License Agreement and this [arbitration] proceeding."  *Id.* at 14–15.  Finally, the panel found that petitioner was entitled to a permanent injunction barring respondent from selling petitioner's software outside the licensed territories.  *Id.* at 16.  In total, the arbitral panel awarded:

> (1) [D]amages or other economic recovery in the total amount of $1,452,649.16 AUD.  At Claimant's election, such amount shall be converted to Unite States Dollars as of the date this Final Award is confirmed by a court of competent jurisdiction. . . .
>
> (2) [P]rejudgment interest on the above amount at a rate permitted by District of Columbia law from June 26, 2023 to the Confirmation Date.
>
> (3) [A]ttorney fees and costs . . . in the amount of $630,483.41 USD.
>
> (4)  $21,248.75 USD in arbitration fees and costs. . . .
>
> (5) [A]n accounting from respondent of all sales of its SmartPad Pro or Quoterite software (or any other software sold by respondent incorporating Claimant's Windowware Pro software) from June 26, 2023 through the date of the Final Award is confirmed.
>
> (6) [A]n injunction prohibiting respondent or any successor in interest from selling its SmartPad Pro, Quoterite Software (or any other software incorporating petitioner's Windowware Pro software) in the United States or in any other location outside the Licensed Territories as defined in the License Agreement.

*Id.* at 16–17.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(a) provides that a party's default must be entered by the Clerk of the Court "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). Upon entry of default, a defaulting party "is deemed to admit every well-pleaded allegation in the complaint." *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (citation omitted). And under Federal Rule of Civil Procedure 55(b), the court may consider entering a default judgment when a party moves for this relief and provides "detailed affidavits or documentary evidence" regarding the appropriate amount due. *See* Fed. R. Civ. P. 55(b); *R.W. Amrine Drywall Co.*, 239 F. Supp. 2d at 30, citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979).

"The determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters and Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F.Supp.2d 56, 57 (D.D.C. 2008), citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980). The default judgment is strongly disfavored because courts prefer to resolve genuine disputes on their merits, and therefore, the default judgment "must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson*, 636 F.2d at 836, quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam).

"[T]he entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F. 3d 1, 6 (D.C. Cir. 2005) (footnote omitted). Before the Court can enter a default judgment, it must assure itself that plaintiff has established that the Court has both subject matter jurisdiction to hear the

case, and personal jurisdiction over the defendant. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014).

## ANALYSIS

**I.     The Court has subject matter jurisdiction over this case under the Federal Arbitration Act.**

Before proceeding to the merits of the default judgment, the Court must determine whether it has subject matter jurisdiction over the dispute. Federal courts are courts of limited jurisdiction with the presumption that "a cause lies outside this limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), so that the Court must "begin with . . . an examination of our jurisdiction." *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004).

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.*, codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") into U.S. law to "provide[]a carefully structured scheme for the enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 733 (D.C. Cir. 2012) ("*Belize I*"), citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Section 202 of the FAA provides that "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the [New York] Convention." 9 U.S.C. § 202. And under section 203 of the FAA, district courts of the United States "shall have original jurisdiction over such an action or proceeding [under the New York Convention], regardless of the amount in controversy." 9 U.S.C. § 203.

The Second Circuit utilizes a four-part test to determine whether an agreement to arbitrate exists under the New York Convention and FAA. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001). Under that test, an arbitral agreement exists where "(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a

7

signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." *Id.* If each element is satisfied, then a district court has proper subject matter jurisdiction over the agreement under the FAA. 9 U.S.C. § 202.

In this case, the record satisfies all four elements of the *Titan* test. The first and second elements are established by the written license agreement between the parties, which contained an arbitration provision stating, "[a]ny controversy, claim or dispute that cannot be so resolved shall be settled by final binding arbitration in accordance using the expedited rules of the American Arbitration Association[.]" License Agreement ¶ 27(b). The arbitration was initiated by petitioner in the United States, which is a signatory of the New York Convention. Pet. ¶ 16; *see Contracting States*, New York Convention, https://www.newyorkconvention.org/contracting-states (last visited Nov. 7, 2025). Respondent did not object to the initiation of arbitration proceeding, and it in fact answered, counterclaimed, selected arbitrators, and participated in discovery until it chose not to appear at the final hearing. Final Award at 3–4.

As for the third element, the subject matter in the dispute between petitioner and respondent is commercial. The D.C. Circuit has defined the term "commercial" in the New York Convention as "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 103–04 (D.C. Cir. 2015) ("*Belize II*"), quoting Restatement (Third) of U.S. Law of Int'l Comm. Arb. § 1–1 (2012). The Circuit has explained that "the full scope of 'commerce' and 'foreign commerce,' as those terms have been broadly interpreted, is available for arbitral agreements and awards." *Belize II*, 794 F.3d at 104 (citation omitted). Here, the license agreement granted respondent the right to market and sell petitioner's software, providing for a fee arrangement and revenue split between the parties. License Agreement ¶¶ 1, 3. Thus, the relationship and the dispute between petitioner and

respondent "arise[s] out of or in connection with commerce" within the broad definition of "commercial." *Belize II*, 794 F.3d at 104 (citation omitted).

As to the fourth element, the subject matter here is not entirely domestic in scope because the agreement between the parties designated certain international territories in which respondent could sell petitioner's software, License Agreement ¶ 6, and the dispute centered around respondent's violation of the agreement by selling software in the United States, United Kingdom, and Canada. Pet. ¶ 14. Furthermore, petitioner and respondent are citizens of different countries, with petitioner being a Colorado limited liability company and respondent being an Australian limited company. Pet. ¶¶ 3–4; *see* 9 U.S.C. § 202 ("An agreement or award arising out of [a commercial relationship] which is entirely between citizens of the United States shall be deemed not to fall under the Convention . . . .").

Therefore, with all of the elements of the *Titan* test satisfied, the Court finds that the license agreement and resulting arbitral award fall under the New York Convention and the FAA.

**II.     The Court has personal jurisdiction over respondent.**

The Court must next consider whether it has personal jurisdiction over respondent. *Jerez*, 775 F.3d at 422.

A court sitting in the District of Columbia has personal jurisdiction over a nonresident defendant if the defendant is subject to the District's long-arm statute. *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 455–56 (D.C. Cir. 1990), which permits "the exercise of personal jurisdiction to the fullest extent permissible under the due process clause." *Johnson v. Long Beach Mortg. Loan Trust 2001-4*, 451 F. Supp. 2d 16, 28 (D.D.C. 2006), quoting *Mouzavires v. Baxter*, 434 A.2d 988, 990–91 (D.C. 1981); *see also* D.C. Code § 13-423(a) (2007). However, a forum selection clause – a contractual clause in which the parties agree to litigate disputes in a particular

9

jurisdiction – substitutes the long-arm statutory and due process requirements of personal jurisdiction. *Water & Sand Int'l Cap., Ltd. v. Capacitive Deionization Tech. Sys., Inc.*, 563 F. Supp. 2d 278, 282 (D.D.C. 2008), citing *Alexander Proudfoot Co. World Headquarters v. Thayer*, 877 F.2d 912, 921 (11th Cir. 1989).  Because personal jurisdiction is waivable, a court "do[es] not offend due process" when it enforces a "freely negotiated" forum selection clause in which the parties expressly consented to the court's jurisdiction, as long as the agreement is not "unreasonable and unjust." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14 (1985); *see Furbee v. Vantage Press*, 464 F.2d 835, 836 (D.C. Cir. 1972) ("[Forum selection clauses] should be respected as the responsible expression of the intention of the parties so long as there is no proof that its provisions will put one of the parties to an unreasonable disadvantage and thereby subvert the interests of justice.").

Here, the license agreement contained a binding forum selection clause:

> The exclusive jurisdiction and venue of any action with respect to the subject matter of this Agreement shall be the District of Columbia Superior Court or the United States District Court for the District of Columbia and each of the parties hereto submits itself to the exclusive jurisdiction and venue of such courts for the purpose of any such action.

License Agreement ¶ 27(e).  Moreover, there is nothing in the record indicating that the forum selection clause or the licensing agreement was unreasonable or unjust.  Thus, the Court has personal jurisdiction over respondent.

### III. The Court will grant the motion for default judgment to confirm the arbitral award.

The Federal Arbitration Act affords federal courts "little discretion" to refuse to confirm a covered arbitral award. *Belize I*, 668 F.3d at 727, citing *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C.Cir.2007) (citation omitted).  The FAA specifically directs that federal courts "shall confirm the award unless it finds one of the grounds for refusal or deferral of

recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207.

The New York Convention enumerates the potential grounds upon which a federal court may refuse recognition and enforcement of an arbitral award under sections 1 and 2 of Article V.

Section 1 recognizes circumstances in which:

> (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>
> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), art. V, § 1, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3. But under Section 1, the party resisting confirmation "bears the heavy burden of establishing that one of the grounds for denying confirmation . . . applies." *Gold Rsrv. Inc. v. Bolivarian* Republic *of Venez.*, 146 F. Supp. 3d 112, 120 (D.D.C. 2015) (citation omitted); *see* New York Convention art. V, § 1 ("Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked . . . "). Given that respondent has not appeared in this case, *see* Aff. for

11

Default; Clerk's Entry of Default, it has not carried its burden to establish any of Section 1 bases for refusing confirmation of Final Award.  Nor do any of those grounds appear to apply given respondent's notice or and participation in the arbitral proceedings.

Section 2 provides two bases for denying recognition and enforcement of an arbitral award, regardless of whether the resisting party furnishes proof:

> (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
>
> (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention art. V, § 2.

Neither of the Section 2 bases are applicable here.  First, the laws of the United States provide remedies for each of petitioner's contractual, copyright, and trade secret claims.  Petitioner and respondent agreed to resolve any dispute arising from the license agreement in arbitration, License Agreement ¶ 27(b), and the claims were in fact settled by the arbitration.  Further, this Circuit has long embraced the "emphatic federal policy in favor of arbitral dispute resolution" that has also been recognized by the Supreme Court.  *Belize I*, 668 F.3d at 727, citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985).  The record in this case does not show any reason to turn away from that recognized public policy.

Because none of the grounds of refusal apply to this case, the Court will grant the motion for default judgement and confirm the arbitral award.

## CONCLUSION

For the reasons above, the Court will **GRANT** petitioner's motion for default judgment [Dkt. # 8] and confirm the arbitral award.  A separate order will issue.

12

/s/ Amy B. Jackson
AMY BERMAN JACKSON
United States District Judge

DATE: November 14, 2025